1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERIC LEE,                                    )        No. C 04-2870 SBA (PR)
                                             )
            Petitioner,                      )        **ORDER DENYING PETITION**
    v.                                       )        **FOR WRIT OF HABEAS**
                                             )        **CORPUS**
J. SOLIS, Warden,                            )
                                             )
            Respondent.                      )
_____     )

**INTRODUCTION**

Petitioner Eric Lee, a prisoner at the Correctional Training Facility, filed this pro se action

seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now submitted for the Court's

consideration of the merits of the petition.  For the reasons discussed below, the petition is DENIED.

**PROCEDURAL BACKGROUND**

In 1985, Petitioner was convicted in the Los Angeles County Superior Court of second degree

murder with the use of a firearm.  He was sentenced to seventeen years to life in state prison,

including a two-year gun enhancement.  The present petition does not challenge Petitioner's

underlying conviction.  Rather, it challenges the denial of parole suitability by the Board of Prison

Terms ("BPT") at a hearing held in 2003.

At the January 29, 2003 hearing, the BPT found Petitioner unsuitable for parole and granted

another hearing in three years.  (Resp't Ex. 4.)  Petitioner sought habeas corpus relief from the Los

Angeles County Superior Court.  On November 14, 2003, the court, in a reasoned decision, denied

the petition.  (Resp't Ex. 5.)  On March 11, 2004, the California Court of Appeal summarily denied

his habeas petition.  (Resp't Ex. 6.)  On June 9, 2004, the California Supreme Court summarily

denied his request for review.  (Resp't Ex. 7.)

On July 17, 2004, Petitioner filed the present petition challenging the denial of parole at his

2003 hearing (docket no.1).[1]  He first contends that the BPT violated his due process rights and

_____

    [1]  On November 16, 2005, Petitioner filed another petition for a writ of habeas corpus in the
Eastern District of California.  On December 12, 2005, that petition was transferred to the Northern
District.  See Lee v. Kane, No. C 05-5138 SBA (PR) (N.D. Cal. Dec. 12, 2005) (petition).  In an

United States District Court
For the Northern District of California

continues to violate it by finding him unsuitable for parole, hence failing to provide him with a reciprocal benefit of his 1985 plea agreement.  He also claims that the parole denial in 2003 violated his right to due process because the factors used by the BPT were not supported by some evidence.

On December 5, 2005, the Court conducted an initial review of the petition and ordered Respondent to show cause why the petition should not be granted (docket no. 2).

On March 6, 2006, Respondent filed a motion to dismiss (docket no. 4).  On March 15, 2006, Petitioner filed an opposition to the motion to dismiss (docket no. 5).  On September 9, 2006, the Court granted Respondent's motion to dismiss as to Petitioner's claim of a due process violation based on the breach of his 1985 plea agreement upon finding that his claim was untimely.  (Sept. 5, 2006 Order at 5.)  The Court denied the motion to dismiss as to Petitioner's claim of a due process violation relating to the BPT's 2003 parole denial upon finding that he had a liberty interest in parole.  (Id. at 9.)  The Court then re-issued the order to show cause and directed Respondent to show cause why the petition should not be granted.  (Id. at 10.)

On October 31, 2006, Respondent filed an answer addressing the 2003 denial (docket no. 9).  On January 1, 2007, Petitioner filed a traverse (docket no. 11).  The Court will proceed to consider the merits of Petitioner's due process claim relating to the 2003 parole denial.

**STANDARD OF REVIEW**

**I.    AEDPA**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a

Order dated July 17, 2006, this Court dismissed the petition as successive pursuant to 28 U.S.C. § 2244(b) because the claims presented in that petition were challenging the same sentence raised in the instant petition.  (July 17, 2006 Order at 2.)

2

petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004), cert. denied, 126 S. Ct. 484 (2005). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**A.    Section 2254(d)(1)**

Challenges to purely legal questions resolved by the state court are reviewed pursuant to § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

**1.    Clearly Established Federal Law**

"[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal

United States District Court

For the Northern District of California

1   law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

2       The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

3   constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the

4   rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at 391.  There are,

5   however, areas in which the Supreme Court has not established a clear or consistent path for courts to

6   follow in determining whether a particular event violates a constitutional right; in such an area, it may

7   be that only the general principle can be regarded as "clearly established."  Andrade, 538 U.S. at 64-

8   65.  When only the general principle is clearly established, it is the only law amenable to the

9   "contrary to" or "unreasonable application of" framework.  See id. at 73.

10      Circuit decisions may still be relevant as persuasive authority to determine whether a

11  particular state court holding is an "unreasonable application" of Supreme Court precedent or to

12  assess what law is "clearly established."  Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir. 2003),

13  cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

14

15              **2.      "Contrary to"**

16      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

17  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

18  state court decides a case differently than [the Supreme] Court has on a set of materially

19  indistinguishable facts."  Williams, 529 U.S. at 412-13.  A "run-of-the-mill state-court decision" that

20  correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's

21  case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  Williams, 529 U.S. at

22  406.  Such a case should be analyzed under the "unreasonable application" prong of § 2254(d).  See

23  Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

24              **3.      "Unreasonable Application"**

25      "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

26  state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

27  unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 412-13.

28      "[A] federal habeas court may not issue the writ simply because that court concludes in its

4

United States District Court
For the Northern District of California

1   independent judgment that the relevant state-court decision applied clearly established federal law

2   erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; accord

3   Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of

4   governing federal law must be not only erroneous, but objectively unreasonable); Woodford v.

5   Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to

6   "incorrect" application of law).

7        Evaluating whether a rule application was unreasonable requires considering the relevant

8   rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is

9   more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

10   Whether the state court's decision was unreasonable must be assessed in light of the record that court

11   had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

12        The objectively unreasonable-standard is not a clear error standard.  Andrade, 538 U.S. at 75-

13   76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging

14   the overruling of Van Tran on this point).  After Andrade, "[t]he writ may not issue simply because,

15   in our determination, a state court's application of federal law was erroneous, clearly or otherwise.

16   While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a

17   greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded

18   them." Id. at 1068.  In examining whether the state court decision was unreasonable, the inquiry may

19   require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045,

20   1054 (9th Cir. 2003).

21

22        **B.    Section 2254(d)(2)**

23        A federal habeas court may grant the writ if it concludes that the state court's adjudication of

24   the claim "resulted in a decision that was based on an unreasonable determination of the facts in light

25   of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable

26   determination of the facts occurs where the state court fails to consider and weigh highly probative,

27   relevant evidence, central to the petitioner's claim, that was properly presented and made part of the

28   state-court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must

presume correct any determination of a factual issue made by a state court unless the petitioner rebuts

the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

### C.    Review of Parole Suitability Decisions

The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions.  See Rosas

v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); see also McQuillion v. Duncan, 306

F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review

under § 2254 applies to such decisions).

## II.    Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

either the fact or length of their confinement are required first to exhaust state judicial remedies,

either on direct appeal or through collateral proceedings, by presenting the highest state court

available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were

exhausted for the claims asserted in the instant petition.

## FACTUAL BACKGROUND

Although Petitioner is not challenging the validity of his underlying criminal conviction, the

facts regarding the commitment offense were relied upon by the BPT panel when Petitioner was

denied parole.  The facts regarding the circumstances surrounding the offense were read into the

record at the hearing, were not objected to by Petitioner, and are in accord with those summarized in

the probation report prepared for the sentencing court after Petitioner's conviction.  The Court

includes that summary here:

> On November 10, 1984, at approximately 9:00 P.M., the victim's brother
> [identified as Ralph Harbin] was engaged in an altercation with an unknown male when
> he became surrounded by "Blood" gang members.  Fearing for his safety, he fled from
> the scene and went to get his brother Edward [deceased victim].  Upon returning with
> Edward and two   other male companions, a second altercation ensued between the
> same initial participants.  At that point, the "Blood" members began surrounding the
> fighting pair once again.  In an effort to protect his brother, Edward yelled to the crowd
> that he was "O.G. Avalon Crip" and asked if anyone wanted to do anything about it.  It
> was then that the suspect [identified as Eric Lamont Lee], who had been observed
> leaving and returning to the scene earlier on a moped bike, stepped from the crowd,
> yelled, "Yea me" and "Mid-City Gangsters."  At that point, he produced what appeared

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  to be a .45 caliber handgun from his waistband.  He then fired the first round which
2  apparently hit the victim in the stomach area causing him to fall to the ground.
   Defendant then ran up to the fallen victim and shot two more rounds striking the victim
3  in the face and neck area.  Defendant then fled from the scene on foot.

4          The victim was subsequently transported to California Hospital where he was
   treated for gunshot wounds to the stomach, neck and face.  He later expired from the
5  gunshot wounds.

6          Defendant was arrested on November 18, 1984, after he himself was shot in an
   apparent gang retaliation as he was observed exiting a vehicle.  Defendant was
7  transferred to the Los Angeles County General Hospital Jail Ward where he received
   treatment for gunshot wounds to the groin and thigh area.  Defendant was subsequently
8  transferred to the Central Juvenile Hall.

9  (Resp't Ex. 2, Probation Officer's Report at 2-3 [brackets in original and paragraph breaks added].)

10         Petitioner's oral statement, included in the Probation Officer's report, was as follows:

11
12         I found the gun Friday, the day before.  It was in a trash can.  I had thrown my
   lunch bag in the trash can and I forgot that I had money in the lunch bag.  I went back
13 to get the lunch bag and I found the gun in the trash barrel.  It was already loaded.  I hid
   it in a sandbox overnight.  I went to get it the next day to sell it.  Around 6:00 P.M., the
14 next day, I went to 51st Street to see my girlfriend.  I left to get something to eat.  I saw
   a fight on the street.  It was Ralph and Brett fighting.  I told Brett to come on, that
15 Ralph was a base head.  Ralph's brother, Ed, came up and said "Who are you suppose
   to be," and he told me to move back.  He said, "It's my brother's fight."  When he said
16 to move, I said no.  He called me a punk and told me that I thought I was tough.  He
   said that he had just gotten out of the pen, and didn't mind going back.  I told him to get
17 somebody his size.  When I turned around, a girl told me to run.  He had his hand in his
   coat and I thought he was trying to get a gun.  He had a gun.  I could see the handle of a
18 gun.  I shot him once.  He got back up off the ground and I shot him again.  He was
   trying to get the gun and when he tried to get up a second time, I shot him again.  I
19 didn't shoot him while he was on the ground.  I never left there to go get a gun, I
   already had it.  I ran and threw it away.  I didn't tell them that I was a Mid-City
20 Gangster.  I wasn't going to let him kill me.

21 (Id. at 10-11.)

22                              **DISCUSSION**

23 I.      **Due Process Claim**

24         A.      **Applicable Legal Standard**

25         "In analyzing the procedural safeguards owed to an inmate under the Due Process Clause, [the

26 Court] must look at two distinct elements:  (1) a deprivation of a constitutionally protected liberty or

27 property interest, and (2) a denial of adequate procedural protections."  Biggs v. Terhune, 334 F.3d

28 910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been afforded

7

an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole. Sass, 461 F.3d at 1129 (adopting "some evidence" standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the 'some evidence' standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Sass, 461 F.3d at 1128 (quoting Hill, 472 U.S. at 455-56). The "'some evidence' standard is minimal, and assures that 'the record is not so devoid of evidence that the finding of the . . . board were without support or otherwise arbitrary.'" Sass, 461 F.3d 1129 (quoting Hill, 472 U.S. at 457). The "some evidence" standard of Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

Three Ninth Circuit cases provide the guideposts for applying the Hill "some evidence" standard on this point: Biggs, Sass, and Irons v. Carey, No. 05-15275, slip op. 8335, 8344 (9th Cir. July 13, 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on

8

United States District Court

For the Northern District of California

unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, slip op. at 8349. Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

The upshot of these three cases is that the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed fifty years ago is less probative of a prisoner's current dangerousness than one committed ten years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an

United States District Court

For the Northern District of California

1    arbitrary decision.

2         What little guidance has come from the Supreme Court suggests that judicial review should

3    be extremely deferential to the original decision-maker in the parole context.  In addition to the very

4    low evidentiary standard that <u>Hill</u> imposes, other Supreme Court comments suggest that the judiciary

5    should be quite mindful of the subjective and predictive nature of a parole board's decision.  <u>See</u>

6    <u>Greenholtz</u>, 442 U.S. at 13.  "No ideal, error-free way to make parole-release decisions has been

7    developed; the whole question has been and will continue to be the subject of experimentation

8    involving analysis of psychological factors combined with fact evaluation guided by the practical

9    experience of the actual parole decisionmakers in predicting future behavior.  Our system of

10   federalism encourages this state experimentation."  <u>Id.</u>

11        **B.**     **Parole for Murderers in California**

12        California uses indeterminate sentences for most non-capital murderers, with the term being

13   life imprisonment and parole eligibility after a certain minimum number of years.  A first degree

14   murder conviction yields a minimum term of twenty-five years to life and a second degree murder

15   conviction yields a base term of fifteen years to life imprisonment.  <u>See</u> <u>Dannenberg</u>, 34 Cal. 4th at

16   1078; CAL. PENAL CODE § 190.  The upshot of California's parole scheme described below is that a

17   release date normally must be set unless various factors exist, but the "unless" qualifier is so great

18   that parole is a rarity rather than the norm for murderers.

19        A BPT panel meets with an inmate one year before the prisoner's minimum eligible release

20   date "and shall normally set a parole release date . . . .  The release date shall be set in a manner that

21   will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to

22   the public, and that will comply with the sentencing rules that the Judicial Council may issue and any

23   sentencing information relevant to the setting of parole release dates."  CAL. PENAL CODE § 3041(a).

24   Significantly, that statute also provides:  The panel shall set a release date,

25        unless it determines that the gravity of the current convicted offense or offenses, or the
           timing and gravity of current or past convicted offense or offenses, is such that
26        consideration of the public safety requires a more lengthy period of incarceration for
           this individual, and that a parole date, therefore, cannot be fixed at this meeting.
27

28

10

Id. § 3041(b).

One of the implementing regulations, Title 15 of the California Code of Regulations § 2401 provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  CAL. CODE REGS. tit. 15, § 2402(a).

In making its determination, the parole board may consider "[a]ll relevant, reliable information available," including,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id. § 2402(b).

Circumstances tending to show unsuitability for parole include the nature of the commitment offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Id. § 2281(c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental

11

health problems related to the offense, and serious misconduct in prison or jail.  See id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release.  See id. § 2281(d).

The regulations also contain a matrix of suggested base terms that prisoners with indeterminate sentence should serve before they are released on parole.  The matrix provides three choices of suggested "base terms" for several categories of crimes.  See CAL. CODE REGS. tit. 15, § 2403.  If, as in Petitioner's case, the base offense is second-degree murder with the use of a firearm, the matrix of base terms ranges from a low of seventeen, eighteen, or nineteen years, to a high of nineteen, twenty, or twenty-one years, depending on some of the facts of the crime.[2]  See id. § 2403(c).  Although the matrix is to be used to establish a base term, this occurs only once the prisoner has been found suitable for parole.  See id. § 2403(a).

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raise "*public safety*" concerns requiring further indefinite incarceration. (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a

---

[2]  One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire."  The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture."  Each of the choices are further defined in the matrix.  See CAL. CODE REGS. tit. 15, § 2403(c).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  parole date on the grounds the particular offender's criminality presents a *continuing*
2  *public danger*.

3  Id. at 1070 (emphasis, brackets and parenthesis in original).  Indeed, the very regulation that
4  includes the matrix states that "[t]he panel shall set a base term for each life prisoner who is found
5  suitable for parole."  CAL. CODE REGS. tit. 15, § 2403(a) (emphasis added).  "[T]he Board,
6  exercising its traditional broad discretion, may protect public safety in each discrete case by
7  considering the dangerous implications of a life-maximum prisoner's crime individually."
8  Dannenberg, 34 Cal. 4th at 1071 (emphasis added).  The California Supreme Court's determination
9  of state law is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988);
10  Sandstrom v. Montana, 442 U.S. 510, 516-17 (1979).

11      The California Supreme Court has determined that the facts of the crime can alone support a
12  sentence longer than the statutory minimum even if everything else about the prisoner is laudable.
13  "While the board must point to factors beyond the minimum elements of the crime for which the
14  inmate was committed, it need engage in no further comparative analysis before concluding that the
15  particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."
16  Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002), cert.
17  denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient
18  basis for denying parole" but might violate due process "where no circumstances of the offense
19  reasonably could be considered more aggravated or violent than the minimum necessary to sustain a
20  conviction for that offense").  Granted the Ninth Circuit has stated that in some cases, "indefinite
21  detection based solely on an inmate's commitment offense, regardless of the extent of his
22  rehabilitation, will at some point violate due process, given the liberty interest in parole that flows
23  from the relevant California statutes."  Irons, 479 F.3d at 665; see also Biggs, 334 F.3d at 917 n.5.

24  **II.    Analysis**

25      **A.    Opportunity to Be Heard and Reasons for Denial**

26      Having stated that California inmates still maintain a liberty interest, the Court analyzes the
27  next prong of the Biggs test.  Under the second prong of the Biggs test, the first question pertains to
28  whether Petitioner was given an opportunity to be heard and whether he was given reasons for the

13

parole denial.  See Biggs, 334 F.3d at 913; Sass, 461 F.3d at 1126; Greenholtz, 442 U.S. at 16.

Petitioner fully participated in his parole hearing as evidenced by the transcript of the hearing.  (Resp't Ex. 3.)  Throughout the hearing, Petitioner was given the opportunity to make comments or objections in response to the BPT's statements, clarify any misunderstandings and give statements regarding his parole eligibility.  (Id.)

In addition, the BPT laid out detailed reasons for denying Petitioner's parole, which are discussed further below.  The Court finds that the BPT satisfied the requirements for due process under this prong.

**B.    "Some Evidence" Standard**

The next question is whether there was some evidence to support the BPT's decision to deny parole.  What little guidance has come from the Supreme Court suggests that the "some evidence" standard is extremely deferential to the original decision-maker.  See Hill, 472 U.S. at 454 (examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence; the relevant question is whether there is any evidence in the record that could support the conclusion reached by the decision-maker).  Moreover, the Supreme Court's comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13 ("No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.").

**1.    The 2003 Parole Hearing**

Petitioner argues that the factors used by the BPT at the 2003 hearing were not supported by some evidence, thus the denial of parole is in violation of his due process rights.  (Traverse at 6.) He claims that his "last three psychological evaluations have consistently found that [his] potential for violence to be below average."  (Id.)  The BPT determined that Petitioner was unsuitable for parole due to a variety of reasons, including the nature of the underlying offense, his prior criminal

14

United States District Court

For the Northern District of California

1    history, his limited programming while incarcerated, his two serious disciplinary violations or

2    "115's" while in prison, his lack of a viable parole plan, and the District Attorney's opposition to

3    parole.  (Resp't Ex. 3 at 49:12-51:21.)

### a.       The Nature of the Offense

5        At the 2003 parole suitability hearing, the BPT found that Petitioner "would pose an

6    unreasonable risk of danger to society or a threat to public safety if released from prison."  (Resp't

7    Ex. 3 at 49:10-12.)  The panel found this was so because the offense was carried out in an

8    exceptionally violent manner, demonstrating a disregard for human life.  The panel then listed the

9    fact-specific reasons it found Petitioner unsuitable for parole:

>           These conclusions were drawn from the Statement of Facts, where on or about
>       the 10th of November, 1984, the inmate while armed with a 45-caliber weapon, did
>       come upon a fight involving one of his gang members and another individual belonging
>       to a rival gang.  He got involved by attempting to stop the fight.  He was then
>       challenged by a brother of the rival gang member.  Words were exchanged at which
>       time the inmate drew a weapon, fired three rounds, sequences unknown, causing the
>       death of the victim.  Shots penetrated the victim's stomach, neck, and face.

14   (Id. at 49:15-50:1.)

15        The panel reiterated the violent nature of the crime and the manner in which it was carried

16   out:

>           The prisoner committed the offense in an exceptionally violent manner.
>       Specifically, on or about the 10th day of November, 1984, apparently there was an
>       altercation between one of his gang members and another individual.  He attempted to
>       intercede, got into a verbal conflict with the brother of one of the combatants.  As a
>       result, drew a weapon, fired, killing Edward Harbin . . . by shooting him in the
>       stomach, neck and face.  The offense was carried out in a manner that demonstrates a
>       disregard for human life.

22   (Id. at 52:13-23.)

### b.       Prior Criminal History

23        Although Petitioner's prior criminal history was minor, the BPT cited his past criminal record

24   as being relevant to the denial of parole.

>           He does have a number of arrests, however, not all of them convictions.  He
>       does have a sustained petition for burglary as a juvenile.  He does have an arrest for
>       possession of controlled substance, which was rejected, insufficient evidence.  He does
>       have an additional arrest for possession of controlled substance, petition was sustained.
>       He had a DA reject for taking a vehicle without the owner's consent.  The last arrest
>       prior to the homicide was the grand theft auto.  No petition was filed on the matter.  I'm

15

1   going to assume because of the arrest for the murder of Mr. Harbin.

2   (Id. at 50:2-14.)

3                   **c.      Unfavorable Activity in Prison**

4       The BPT also determined that Petitioner's activities in prison were unfavorable, and this

5   served as another reason to find him unsuitable for parole.  Specifically, the BPT found that Petitioner

6   had recently committed two serious disciplinary violations (CDC 115's) and received a 128

7   counseling chrono:

8           The inmate during incarceration programmed in a limited manner.  He's failed
9           to develop a marketable skill that can be put to use upon his release.  He's failed
            to upgrade himself vocationally and not sufficiently participated in beneficial self-help
10          and therapy programming.  During his incarceration he received nine 128(a) counseling
            chronos, one since his last hearing, that was 6/11/02, failed to report to job assignment.
11          He received two 115's since his incarceration; the last one being, one since his last
12          hearing, on 7/27/02, disobeying a direct order during an emergency alarm.

13  (Id. at 50:14-26.)

14                  **d.      Lack of Viable Parole Plan**

15      The BPT noted that Petitioner's parole plan was to reside with his "Aunt Thelma," who

16  submitted a letter of support.  (Id. at 18:19-24.)  Because her letter was submitted on September 16,

17  2001, prior to Petitioner's previous parole hearing, he could not assure the panel that his aunt was still

18  alive or that she still wanted him to reside with her.  (Id. at 20:2-22.)  Similarly, the panel noted that

19  Petitioner's childhood friend wrote a letter offering him a job upon parole.  (Id. at 19:6-14.)  That

20  letter was not dated; therefore, the panel could not clarify if the offer was still valid.  (Id. at 22:1-3.)

21  The panel concluded that Petitioner had "no parole plans in that he does not have verifiable viable

22  residential plans, nor does he have verifiable acceptable employment plans."  (Id. at 51:12-15.)

23                  **e.      District Attorney's Opposition to Parole**

24      The Deputy District Attorney of Los Angeles County opposed Petitioner's suitability for

25  parole.  He stated that Petitioner's "failure to be candid with the Board as to the circumstances of the

26  life crime" was a major reason for his opposition to a finding of parole suitability:

27          . . . I think one of the largest problems is in reviewing his statements, some of
            which the Board has addressed, that Mr. Lee has made about the life crimes over the

28

United States District Court
For the Northern District of California

16

United States District Court

For the Northern District of California

1

2

3

4

years, there's been some changes.  And I think at one time there was an indication from
Mr. Lee that he had shot the victim initially in the leg.  That no longer seems to be the
story, now the story is that he's not sure if he hit him the first time.  I think that the, my
understanding of the facts, is the victim was not shot in the leg.  And that may well
explain why there's been this change to now saying that Mr. Lee doesn't remember or
doesn't know if he shot him the first time, because the evidence won't support the idea
that the victim was shot in the leg.

5

6

7

8

9

10

So I think that the failure to be candid with the Board as to the circumstances of
the life crime, is a very serious issue, because the life crime obviously is a very serious
issue.  Any murder obviously is serious.  But one where you shoot an individual three
times claiming self-defense and apparently, if in fact the victim did have a gun, he
never fired a shot, apparently never got the gun out of his waistband, yet he was shot
three times, apparently in the stomach, the neck and the head.  When you combine this
with the fact that Mr. Lee has picked up a disciplinary CDC 115 and a 128 since his last
hearing, those kinds of behavior problems combined with what appears to be a failure
to come clean with the Board concerning the life crime, I think makes Mr. Lee at this
time not a good candidate to receive a parole date.

11

(Id. at 44:20-45:26 [paragraph break added].)

12

### f.    Conclusion

13

14

In conclusion, the panel listed fact-specific reasons to support its finding that Petitioner

was unsuitable for parole:

15

16

17

18

19

. . . that the inmate needs additional time in order to fully understand and deal with the
causation factors that led to the commitment of the life crime.  Until progress is made,
the prisoner continues to be unpredictable and a threat to others.  The prisoner's gains
are recent.  He must demonstrate an ability to maintain gains over an extended period
of time.  Nevertheless, he should be commended for being involved in AA and also . . .
NA, and also completing Anger Management.  However, these positive aspects of his
behavior do not outweigh the factors of unsuitability.

20

(Id. at 51:22-52:8.)  The panel added:

21

22

23

24

The prisoner has recently committed serious disciplinary violations.  Specifically, a 115
on 7/27/02, which is for disobeying a direct order during an emergency.  The inmate
has not completed necessary programming which is essential to his adjustment and
needs additional time to gain such programming.  He's failed to complete a vocation
and he's failed to adequately participate in self-help.

25

26

27

28

(Id. at 52:23-53:6.)  Finally, the panel further stated that two correctional counselor's reports on

August, 2001 and December, 2002 "indicated the degree of threat as moderate."  (Id. at 53:6-11.)

Therefore, the panel concluded "a longer period of observation and evaluation is required before the

Board should find the inmate suitable for parole."  (Id. at 53:11-14.)

United States District Court

For the Northern District of California

1    The Court finds that the BPT's 2003 decision was based on a reasonable determination of the

2    facts and that there was some evidence to support the conclusion to deny Petitioner's parole.  28

3    U.S.C. 2254(d)(2).

4        **2.    Superior Court Denial**

5    On state habeas corpus review, the Los Angeles Superior Court concluded that "'some

6    evidence' supports each of the Board's findings, including the Board's findings with regard to

7    petitioner's commitment offense, petitioner's parole plans and institutional behavior."  (Resp't Ex.5

8    at 2).  The superior court considered the BPT's determinations that the offense was carried out in "an

9    exceptionally violent manner, demonstrating a disregard for life" and that Petitioner was "not

10   suitable for parole and would pose an unreasonable risk of danger to society or a threat to public

11   safety if released from prison."  (Id.)  The court denied the petition upon concluding that Petitioner's

12   due process rights had not been violated:

13       . . .there is no evidence that petitioner's right to due process was violated.  The
         Board reviewed petitioner's C-file and properly conducted the suitability hearing in
14       petitioner's presence, and in the presence of petitioner's attorney.  Petitioner was given
         an opportunity [to] speak and to provide information he felt was necessary.
15

16       Additionally, petitioner's argument of a "no parole policy" has been rejected.
         (In re Rosenkrantz, 29 Cal.4th 616, 684).
17

18       The Board's finding of parole unsuitability was supported by "some evidence"
         (In re Rosenkrantz), especially in light of petitioner's recently issued 115 disciplinary
19       and 128 counseling chrono.  Accordingly, the petition for writ of habeas corpus is
         denied.
20
     (Id. at 3 [brackets added].)

21   Because the superior court's decision is the last reasoned decision regarding Petitioner's

22   challenge to the 2003 hearing, it is this decision which the Court reviews under 28 U.S.C.

23   § 2254(d).  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d

24   1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

25   The state court "independently reviewed the record before the Board with deference to the

26   Board's 'broad discretion' in parole matters." (Resp't Ex. 5 at 2 [citing In re Rosenkrantz, 29 Cal. 4th

27   at 656].)  The court concluded that "'some evidence' support[ed] each of the Board's findings,

28

18

United States District Court

For the Northern District of California

1    including the Board's findings with regards to petitioner's commitment offense, petitioner's parole

2    plans and institutional behavior."  (Id.)  The Court finds that the state court's decision to uphold the

3    BPT's findings was not based on an unreasonable determination of the facts in light of the evidence

4    presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an

5    unreasonable application of clearly established federal law, id. § 2254(d)(1).

6         Having reviewed the facts of the crime as recited by the BPT and the state court, and the

7    other reasons stated for finding Petitioner ineligible for parole, the Court finds that there was some

8    evidence in the record to support the BPT's decision.

9         Accordingly, Petitioner's due process challenge to the denial of parole by the BPT is

10   DENIED.

11        **C.    Other Arguments**

12        Petitioner makes three additional arguments: (1) that to deny him parole based on his

13   commitment offense violates his due process rights; (2) that he is long overdue for parole under the

14   State's sentencing matrix in violation of his due process rights; and (3) that the BPT is systematically

15   biased in denying parole in violation of his due process rights.  The Court finds that these arguments

16   must fail as follows:

17        **1.    *Biggs* Argument**

18        Petitioner argues that the BPT's use of his commitment offense without additional evidence

19   violates Biggs.  (Traverse at 6).  Petitioner cites Biggs for the proposition that "continued reliance in

20   the future on an unchanging factor, the circumstance of the offense and conduct prior to

21   imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could

22   result in a due process violation."  Biggs, 334 F.3d at 916-17.

23        In Biggs, the prisoner was serving a sentence of twenty-five years to life following a 1985

24   first degree murder conviction.  In the case before the Ninth Circuit, Biggs challenged the 1999

25   decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  Id. at

26   913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs

27   unsuitable, it upheld three:  (1) the commitment offense involved the murder of a witness, (2) the

28

murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another, and (3) Biggs could benefit from therapy.  Id.  The Ninth Circuit found no due process violation and upheld the prisoner's parole denial based solely on the nature of the crime and conduct before incarceration.  Id. at 916.

Petitioner's reliance on Biggs to support his argument that denial of suitability in his individual case is misplaced.  First, although the Biggs's court cautioned the BPT that continued reliance in future parole suitability hearings on the commitment offense may violate due process, id. at 916-17, it did so only in dicta.  Not only is it not Supreme Court law, but the Ninth Circuit has also recently criticized the statements in Biggs as being improper and beyond the scope of the dispute before the court.  The Ninth Circuit stated, "Under AEDPA, it is not our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at 1129.  Sass confirmed that "evidence of [a prisoner's] prior offenses and the gravity of his convicted offenses constitute some evidence to support the [b]oard's decision."  Id.  In light of Sass, the BPT's consideration of Petitioner's conviction offense and prior criminal conduct satisfies the minimal "some evidence" requirement.

Secondly, it must be noted that the BPT did not rely solely on the commitment offense and prior history in denying Petitioner suitability for parole at his fourth parole hearing.  The BPT relied on several factors, including the nature of the underlying offense, Petitioner's prior criminal history, his limited programming while incarcerated, his two serious disciplinary violations or "115's" while in prison, his lack of a viable parole plan, and the District Attorney's opposition to parole, before finding him unsuitable for parole.

Accordingly, the Court finds no merit to Petitioner's claim because he cannot rely on the dicta in Biggs to demonstrate that the BPT violated his due process rights by denying him parole suitability.

### 2.      Matrix Argument

Petitioner also argues that the BPT violated his right to due process because he is overdue for release under the BPT's sentencing matrix.  (Pet. at 5, 9.)

20

As explained previously, the matrix is not consulted and a term is not set under state law unless and until the prisoner is found suitable for parole.  See Dannenberg, 34 Cal. 4th at 1070-71; CAL. CODE REGS. tit. 15, § 2403(a).  Petitioner was not found suitable for parole; therefore, the matrix did not need to be consulted.  Moreover, the BPT determined that Petitioner was unsuitable for parole after considering the factors outlined above.  Thus, Petitioner's claim that there was "no real evidence" to deny him parole is unavailing.  Even if Petitioner had a due process right in having state law followed by the parole authority, state law was followed by the BPT.

Accordingly, Petitioner's claim is without merit.

### 3.   Anti-Parole Argument

Petitioner claims the BPT has an "anti-parole policy" which violates his state and Federal due process rights.  (Pet. at 5).  Petitioner cites California Penal Code § 3041(a) which states that the BPT shall meet one-year prior to a prisoner's minimum eligible parole date and then set a parole release date.

A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2241(c)(3).  A petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995).  Specific factual allegations, not conclusions, are required.  Id.; Boehme v. Maxwell, 423 F.2d 1056, 1058 (9th Cir. 1970).

Petitioner alleges in a conclusory manner that the BPT has a systematic bias in their decision making but does not allege any facts to demonstrate that the BPT denied him parole due to this alleged bias.  The Court finds that the BPT took into account the specific facts of Petitioner's case and based on an individualized determination of parole eligibility, the BPT denied him parole.   As a result, Petitioner's bias claim is too conclusory to establish a basis for federal habeas relief.  Jones, 66 F.3d at 204-05; Boehme, 423 F.2d at 1058.

Accordingly, the Court finds no merit to Petitioner's due process challenge to his 2003 parole denial based on allegations that the BPT has an anti-parole or under-inclusion policy.

**United States District Court**
For the Northern District of California

1

## CONCLUSION

2      For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of

3   the Court shall enter judgment and close the file.

4      IT IS SO ORDERED.

5

6   DATED:7/23/07

*Saundra B Armstrong*

SAUNDRA BROWN ARMSTRONG
United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

**United States District Court**
For the Northern District of California

1

2                            UNITED STATES DISTRICT COURT

3                                         FOR THE

4                            NORTHERN DISTRICT OF CALIFORNIA

5

6

7    LEE,                                              Case Number: CV04-02870 SBA

8                Plaintiff,                            **CERTIFICATE OF SERVICE**

9       v.

10   SOLIS et al,

11
                 Defendant.
12   _____/

13
     I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
14   Court, Northern District of California.

15   That on July 23, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
16   envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
     located in the Clerk's office.
17

18

19   Eric  Lee D-11150
     Correctional Training Facility
20   P.O. Box 689
     Soledad,  CA 93960-0689
21

22   Dated: July 23, 2007

23                                                    Richard W. Wieking, Clerk
                                                      By: LISA R CLARK, Deputy Clerk
24

25

26

27

28

                                                 23